Filed 2/9/23  P. v. Vierra CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID VIERRA,<br><br>Defendant and Appellant. | B314070<br><br>Los Angeles County<br>Super. Ct. No. VA153998 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Roger T. Ito, Judge.  Reversed in part, sentence vacated, and remanded with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted David Vierra of committing 13 sexual offenses against four victims, most of whom were minors. On appeal, Vierra argues some of his convictions are not supported by substantial evidence, the trial court made instructional errors, the court admitted improper expert testimony, the prosecutor engaged in misconduct, and the jury erroneously convicted him of both continuous sexual abuse and committing individual lewd acts on the same victim during the same time period. He also contends his case must be remanded for resentencing in accordance with Senate Bill No. 567 (2021–2022 Reg. Sess.). We reverse Vierra's conviction for continuous sexual abuse and remand the case for resentencing. We affirm the judgment in all other respects.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *Background*

The People charged Vierra with 14 counts of sex crimes committed against four victims. All of the victims are relatives of Dora L., whom Vierra dated and eventually married.

Vierra and Dora have one child together, I.V. (born in November 2014). I.V. is autistic and non-verbal. Dora also has two sons from a previous marriage: J.L. (born in December 2005), and M.L. (born in March 2008). J.L. is also autistic, but he is verbal and does not require as much support as I.V.

### 2. *Counts related to M.L.*

In December 2019, when M.L. was 11 years old, his friend sent him an image of two men having sex. Vierra saw the image on M.L.'s phone and showed it to Dora. Dora became angry with M.L., and M.L. told her, "That's what [Vierra] did to me." Dora kicked Vierra out of the house and called the police.

M.L. spoke to a forensic interviewer on May 15, 2020. At trial, the prosecutor played a video of the interview for the jury.

M.L. told the interviewer that Vierra had sexually assaulted him between 10 and 20 times. M.L. said the first assault happened in January 2019 while Dora was at a Bible study class, which she had started attending the previous week. Vierra grabbed M.L.'s arm, pulled him into a bedroom, and threw him onto the bed. Vierra took off M.L.'s clothes and flipped him over so that his stomach was touching the bed. M.L. felt Vierra's penis in his "butt," and Vierra moved his body up and down. M.L. eventually felt Vierra ejaculate. Vierra then told M.L. to suck his penis, which M.L. did.

M.L. recalled another incident that happened while his cousin, D.M., was visiting. D.M. would have been around 19 years old at the time. Vierra told M.L. and D.M. to go into a bedroom to work on a school project. Vierra came into the room and put his penis in D.M.'s "butt."

The last incident M.L. could recall happened in May 2019. Dora left the house to go to a restaurant with a friend. Vierra told D.M. to go into his room. Vierra then put his penis inside D.M.'s mouth and anus.

M.L. testified at trial in July 2021, more than a year after the interview. M.L. testified that Vierra touched him for the first time in February 2019, when he was ten years old. M.L. was massaging Vierra's arm with his knees. Vierra grabbed M.L.'s penis and started playing with it.

M.L. said Vierra touched him for the second time in March 2019, but he gave inconsistent testimony about whether the

incident happened before or after his 11th birthday.  We discuss the inconsistencies in more detail below.

During the second incident, Vierra told M.L. to get naked and get on the bed.  Vierra closed the bedroom door and took off his clothes.  Vierra put his penis in M.L.'s mouth and told him to suck it.  After Vierra finished, he told M.L. he would hurt him if he told anyone.

The third incident occurred about a week later—which M.L. clarified was after his birthday—while Dora was at Bible study.  Vierra again told M.L. to go to his room and take off his clothes, which M.L. did.  Vierra put his penis inside M.L.'s mouth.  He then told M.L. to lie on the bed with his stomach facing down.  Vierra put his penis inside M.L.'s anus.  Vierra moved M.L. back and forth, and M.L. eventually felt Vierra ejaculate on his body.

M.L. recalled a fourth incident that happened around two weeks later.  Vierra sat on the edge of the bed and told M.L. to ride his penis.  M.L. got on Vierra's lap and faced away from him.  Vierra put his penis inside M.L.'s anus.  Vierra moved M.L.'s body up and down while moaning.  Vierra ejaculated after a few minutes.

According to M.L., Vierra assaulted him in a similar manner eight or nine more times.  Around June 2019, Vierra had M.L. ride his penis in the backseat of a car.  Another time, Vierra put his penis inside M.L.'s anus while Dora was at a restaurant with friends.

M.L. testified that in April 2019, Vierra drove him to a store to get food.  While in the car, Vierra showed M.L. a video on his phone of two men having sex.  Vierra said, "[T]his is what you have to do to me to make sex better."

4

### 3. *Counts related to J.L. and I.V.*

J.L. spoke to a forensic interviewer the same day as M.L. The prosecutor played for the jury a video of the interview.

J.L. told the interviewer that Vierra grabbed his genitals in the summer of 2015, when J.L. was nine years old. Vierra also made J.L. watch an extremely graphic pornographic video called "Two Girls One Cup."

J.L. said that another day, he was watching television when he heard I.V. scream. J.L. opened the bedroom door and saw "[I.V.] getting raped by my stepfather [Vierra]. . . . Vierra put his, put his dick in his butt and he told me not to tell anyone because if I told anybody he would ground me for that . . . ."

According to J.L., Vierra was not wearing pants. I.V. was lying on his stomach and wearing a diaper. J.L. initially said the diaper was "[o]n"; later, he said it was "[o]ff."

At trial, J.L.'s testimony regarding Vierra grabbing his genitals and forcing him to watch pornography was generally consistent with his statements during the interview. His testimony regarding the incident with I.V., however, was significantly different. J.L. testified that when he looked in the bedroom, he saw Vierra "[p]utting his dick on [I.V.'s] diaper." J.L. said I.V. was wearing the diaper and the diaper was "up." According to J.L., this happened in 2018, before I.V.'s birthday.[1]

### 4. *Counts related to D.M.*

D.M. is Dora's nephew. In December 2019, D.M.'s father told him that M.L. had accused Vierra of sexual assault, and

---

[1] J.L. testified that the incident occurred before I.V's "fifth birthday in 2018." I.V., however, was born in 2014, meaning he would have turned four years old in 2018.

D.M. broke down crying. D.M. told his father M.L. was telling the truth because the same thing had happened to him. D.M. said Vierra had touched him three times, but he did not give any details. This was the first time D.M. had told anyone that Vierra had sexually assaulted him.

At trial, D.M. testified that Vierra first assaulted him in November 2013, when he was 13 years old. Vierra and Dora were dating at the time, and D.M. agreed to help Vierra move into Dora's house. D.M. already knew Vierra, because Vierra had been his baseball coach the previous year. Vierra did not have a child on the team.

According to D.M., after they finished working for the day, Vierra told him to take a shower. D.M. started showering, and, at some point, Vierra got into the shower with him. Vierra told D.M. they needed to save water. Vierra rubbed soap on D.M.'s body, including his genitals. Vierra then put his penis inside D.M.'s anus, which hurt. Vierra took his penis out after a few seconds and then got out of the shower.

D.M. testified that Vierra assaulted him again on his 18th birthday, in January 2018. D.M.'s grandmother (Dora's mother) had been diagnosed with pancreatic cancer and was living at Dora and Vierra's house. D.M. decided to sleep at their house so he could spend more time with his grandmother. Vierra suggested that D.M. sleep in his bedroom, and D.M. fell asleep in the room by himself.

At some point during the night, D.M. woke up to Vierra on top of him. Vierra's entire weight was resting on D.M.'s back, pinning him to the bed. Vierra penetrated D.M.'s rectum with his penis and thrust his body. Vierra ejaculated and said, "happy birthday."

**5.** *Child Sexual Abuse Accommodation Syndrome evidence*

The prosecutor presented expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) from Jayme Jones, who is a clinical psychologist for child victims of sexual assault. Jones has treated between 700 and 900 child sexual abuse patients, and she has testified as a CSAAS expert in 80 to 90 cases.

According to Jones, Dr. Roland Summit developed CSAAS in order to help counter common misunderstandings about child victims of abuse. Summit developed the original model based on his own clinical experience as well as the clinical experiences of other professionals. There have been 30 to 50 research base studies examining CSAAS, it is generally accepted in the scientific community, and it has been in regular use for training and education purposes. Jones uses CSAAS in her practice while treating child victims of sexual abuse.

Jones explained that CSAAS is actually a misnomer because it is a model, not a syndrome. CSAAS cannot be used to diagnose or determine whether sexual abuse actually occurred. Instead, the model assumes abuse occurred.

Jones discussed the five components of the model, which help to explain the behavior of child victims of sexual abuse: (1) secrecy—child sexual abuse typically happens in private, which sends an implicit message that the child should not talk about it; (2) helplessness—children are physically smaller and are taught to do what adults tell them to do; (3) accommodation—children use a variety of coping mechanisms to deal with the abuse; (4) delayed disclosure—most disclosures

are delayed and come out in pieces; and (5) recantation—some victims make disclosures and then take them back.

## 6. *Defense evidence*

Vierra testified in his own defense. He denied sexually assaulting the victims or showing them pornography. According to Vierra, M.L. is highly intelligent, often lies, and knows how to manipulate situations. M.L. and Vierra did not have a good relationship, and they often argued. When they argued, Dora would become angry with Vierra and kick him out of the house.

Vierra's mother, Mary Vierra, testified that she would babysit M.L. and J.L. when they were around six and eight years old, respectively. M.L. and J.L. would take snacks they were not supposed to have and lie about it. M.L. would act fragile and cry when confronted with something bad that he did. M.L. was a "complicated child," "lied a lot," and was manipulative.

When M.L. was around six years old, Mary saw him playing a game with D.M. that made her uncomfortable. D.M. would sit on the couch, and M.L. would sit on his lap. They would face each other and snuggle. Mary told Dora about the game, but Dora did not react the way Mary expected. Dora stopped talking to Mary after that. About six weeks later, Dora told Mary she no longer needed her to babysit the children.

## 7. *Verdicts and sentencing*

As to I.V., the jury convicted Vierra of sexual intercourse or sodomy with a child under 11 years old (Pen. Code, § 288.7, subd. (a)[2]; count 1). It found him not guilty of committing a lewd act upon a child under 14 years old (§ 288, subd. (a); count 14), which the People charged in the alternative to count 1.

---

[2]     Statutory references are to the Penal Code.

8

As to J.L., the jury convicted Vierra of committing a lewd act upon a child under 14 years old (§ 288, subd. (a); count 2) and showing pornography to a minor (§ 288.2, subd. (a)(2); count 3).

As to D.M., the jury convicted Vierra of sodomy of a person under 14 years old (§ 286, subd. (c)(1); count 4) and sodomy by use of force (§ 286, subd. (c)(2)(A); count 5).

As to M.L., the jury convicted Vierra of sexual intercourse or sodomy with a child under 11 years old (§ 288.7, subd. (a); count 6), oral copulation or sexual penetration with a child under 11 years old (§ 288.7, subd. (b); count 7), four counts of committing a lewd act upon a child under 14 years old (§ 288, subd. (a); counts 8, 9, 10, 11), showing pornography to a minor (§ 288.2, subd. (a)(2); count 12), and continuous sexual abuse (§ 288.5, subd. (a); count 13).

The jury found true multiple victim allegations on counts 2, 5, 8, 9, 10, 11, and 13 (§§ 1203.066, subd. (a)(7), 667.61, subds. (b)–(e)).  On counts 8, 9, 10, 11, and 13, the jury found that in the commission of the offenses, Vierra engaged in substantial sexual conduct with a victim under 14 years old (§ 1203.066, subd. (a)(8)).

The court sentenced Vierra to an aggregate term of eight years plus 155 years to life, consisting of the following: on count 1, 25 years to life; on count 2, 15 years to life; on count 3, two years concurrent with the base determinate term (count 4); on count 4, the high term of eight years; on count 5, 15 years to life; on count 6, 25 years to life; on count 7, 15 years to life; on counts 8, 9, 10, and 11, four consecutive terms of 15 years to life; and on count 12, two years concurrent with the base determinate term (count 4).  The court stayed the sentence

9

on count 13 (continuous sexual abuse) in light of the sentence on counts 8 through 11 (lewd act on a child).

Vierra timely appealed.

## DISCUSSION

1. ***The court's failure to instruct the jury on lesser included offenses was harmless***

Vierra argues the trial court prejudicially erred by failing to instruct the jury on lesser included offenses related to count 6 (§ 288.7, subd. (a)) and count 7 (§ 288.7, subd. (b)), which both concern sexual assaults against M.L. He contends that, because there is evidence from which the jury could have concluded M.L. was 11 years old during the first acts of sodomy and oral copulation, the court was required to instruct on the lesser included offenses of sodomy with a minor (§ 286, subd. (b)(1)) and oral copulation with a minor (§ 287, subd. (b)(1)).

a. *Background*

The People charged Vierra in count 6 with sodomy or sexual intercourse with a child under 11 years old (§ 288.7, subd. (a)) and in count 7 with oral copulation or sexual penetration with a child under 11 years old (§288.7, subd. (b)). As their names suggest, both offenses require the People to prove the defendant committed the prohibited act with a child who was under 11 years old.

At trial, the prosecutor presented conflicting evidence concerning the dates of the offenses. In M.L.'s videotaped interview, he said Vierra sexually assaulted him for the first time in January 2019, when he was ten years old. M.L. described the incident in some detail, including that he "suck[ed]" Vierra's penis and felt Vierra's penis in his "butt."

10

At trial, M.L. testified that Vierra first touched his genitals sometime around February 2019. The prosecutor then asked whether "there [was] another time after that that [Vierra] touched you or did something to you." M.L. responded that there was another time "right around my [11th] birthday," which was in mid-March. The prosecutor asked M.L. whether the incident happened before or after his birthday, and M.L. replied, "I believe after."

Seemingly unhappy with M.L.'s response, the prosecutor asked him, "What was the second time that [Vierra] touched you?" M.L. replied that it was in March, "[a]round my birthday." Upon further questioning, he said it was "after or around" his birthday, and "a little after my birthday." The prosecutor continued to press M.L. on the issue until the court instructed her at sidebar to stop trying to prime M.L. to give the answer she wanted.

After the sidebar, the prosecutor directly asked M.L. how old he was during the second incident. M.L. replied, "I was ten." M.L. then testified that he orally copulated Vierra during the second incident. On cross examination, M.L. clarified that he orally copulated Vierra a few days before his 11th birthday.

As to the first act of sodomy, M.L. testified on direct that it happened after his birthday. On redirect, he testified that it was "really close to my birthday," but he "believe[d] it was after."

At the close of the People's case, Vierra moved to dismiss all the counts under section 1118.1. In response, the court asked the prosecutor to summarize the evidence that Vierra sodomized M.L. while M.L. was under 11 years old. The prosecutor pointed to M.L.'s forensic interview, in which he said the first act of

11

sodomy occurred when he was ten years old. Based on that evidence, the court denied Vierra's motion.

    b.    *Analysis*

Even in the absence of a request, a trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*); *People v. Whalen* (2013) 56 Cal.4th 1, 68–69.) A court must instruct on a lesser included offense whenever there is evidence the defendant is guilty of the lesser offense but not of the greater. (*Whalen*, at pp. 68–69.) However, the court is required to give a particular instruction sua sponte only if there is substantial evidence from which a jury composed of reasonable people could find true the facts underlying the instruction. (*Breverman*, at p. 162.) Doubt as to the sufficiency of the evidence to warrant a particular instruction should be resolved in the defendant's favor. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

An uncharged lesser offense is necessarily included within a charged offense "if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117; see also *People v. Sloan* (2007) 42 Cal.4th 110, 117.) Vierra contends that, under either test, sodomy and oral copulation with a minor are lesser included offenses of sodomy and oral copulation with a child under 11 years old. The Attorney General concedes the issue.

Contrary to Vierra's contentions—and the Attorney General's concessions—sodomy and oral copulation with a minor are not lesser included offenses under the statutory elements

12

test.  Sexual intercourse or sodomy with a child under 11 years old has three elements:  (1) the defendant engaged in sexual intercourse or sodomy; (2) with a child under 11 years old; and (3) while the defendant was at least 18 years old.  (§ 288.7, subd. (a); *People v. Mendoza* (2015) 240 Cal.App.4th 72, 79 (*Mendoza*).)  Sodomy with a minor has two elements:  (1) the defendant engaged in sodomy; (2) with another person who is under 18 years old.  (§ 286, subd. (b)(1).)  The former offense prohibits both sexual intercourse and sodomy, whereas the latter offense prohibits only sodomy.[3]  Therefore, an adult defendant who engages in sexual intercourse with a child under 11 years old violates section 288.7, subdivision (a), but does not violate section 286, subdivision (b)(1).  Because it is possible to violate section 288.7, subdivision (a), without violating section 286, subdivision (b)(1), the latter offense is not necessarily included in the former under the elements test.  (See *People v. Mitchell* (2008) 164 Cal.App.4th 442, 460–461 [if the greater offense can be committed in some manner without also committing the lesser offense, the latter is not a lesser included offense of the former].)

The same is true of engaging in oral copulation or sexual penetration with a child under 11 years old (§ 288.7, subd. (b)) and oral copulation with a minor (§ 287, subd. (b)(1)).  The former offense prohibits both oral copulation and sexual penetration,

---

[3]  "Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."  (*Mendoza, supra*, 240 Cal.App.4th at p. 79.)  Sodomy means "sexual conduct consisting of contact between the penis of one person and the anus of another person."  (§ 286, subd. (a).)

whereas the latter offense prohibits only oral copulation.[4] An adult defendant who sexually penetrates a child under 11 years old, therefore, violates section 288.7, subdivision (b), but does not violate section 287, subdivision (b)(1). Accordingly, the latter offense is not a lesser included offense of the former under the elements test.

Nevertheless, we agree with the parties that, in this case, sodomy and oral copulation with a minor are lesser included offenses under the accusatory pleadings test. The People alleged in the operative information that, when Vierra was an adult, he engaged in "sexual intercourse *and* sodomy" (count 6), as well as "oral copulation *and* sexual penetration" (count 7), with M.L., who was under 11 years old. (Italics added.) In order to prove those allegations, the People necessarily had to prove all the elements of sodomy and oral copulation with a minor. Accordingly, sodomy and oral copulation with a minor are lesser included offenses under the accusatory pleadings test.

We also agree with the parties that the evidence warranted an instruction on the lesser included offenses. At various points during his trial testimony, M.L. said the first acts of oral copulation and sodomy occurred after his 11th birthday. If true, Vierra would be guilty of engaging in oral copulation and sodomy with a minor (§§ 286, subd. (b)(1), 287, subd. (b)(1)), but not engaging in oral copulation or sodomy with a child under

---

[4] Oral copulation "is the act of copulating the mouth of one person with the sexual organ or anus of another person." (§ 287, subd. (a).) Sexual penetration "is the act of causing the penetration, however slight, of the genital or anal opening of any person . . . ." (§ 289, subd. (k)(1); see § 288.7, subd. (b).)

14

11 years old (§ 288.7, subds. (a), (b)).  Therefore, the court should have instructed the jury on the lesser offenses.

We next turn to the issue of prejudice.  We review a trial court's failure to instruct on a lesser included offense for prejudice under the *People v. Watson* (1956) 46 Cal.2d 818 harmless error standard.  (*Breverman, supra*, 19 Cal.4th at p. 165.)  Such an error "does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' " (*People v. Wyatt* (2012) 55 Cal.4th 694, 698; *People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Here, it is not reasonably probable the court's errors affected the outcome.  M.L.'s testimony at trial provided the only evidence suggesting the first oral copulation and sodomy incidents occurred after his 11th birthday.  M.L.'s testimony, however, was generally equivocal, and it was apparent that he was struggling to recall specific dates.  With respect to the first incident of sodomy, for example, he testified that it happened "really close" to his birthday, but he "believe[d]" it was after.  With respect to the first oral copulation incident, he initially testified it was "after or around" his birthday and he "believe[d]" it was after.  Later, he repeatedly testified that it occurred before his 11th birthday, when he was 10 years old.

M.L.'s account of the incidents during the forensic interview was far more detailed and reliable.  He stated unequivocally that Vierra engaged in sodomy and oral copulation with him in January 2019, which was two months before his 11th birthday.  M.L. was able to recall specific details about the date, explaining it was the second night of Dora's Bible study class, and was either a Wednesday or Thursday.  This was

15

consistent with Dora's testimony at trial that she started attending Thursday Bible study classes in January 2019. Moreover, unlike the trial, the interview was conducted in an environment and under circumstances designed to make M.L. feel comfortable.[5] It also took place more than a year before the trial, when the incidents would have been fresher in M.L.'s mind.

On this record, there is not a reasonable probability that any of the jurors convicted Vierra of counts 6 and 7 while remaining unconvinced that both incidents occurred before M.L.'s 11th birthday. Accordingly, the court's instructional errors were harmless and do not require reversal.

**2.** ***Substantial evidence supports Vierra's convictions on counts 6 and 7***

Vierra challenges the sufficiency of the evidence supporting his convictions on count 6 (§ 288.7, subd. (a)) and count 7 (§ 288.7, subd. (b)), which both concern sexual assaults against M.L. Vierra asserts there is not substantial evidence that he engaged in the sex acts while M.L. was under 11 years old, which is a required element of both offenses.

In considering the sufficiency of evidence in a criminal appeal, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—so that any rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Burton* (2006) 143 Cal.App.4th 447, 451; *People v. Johnson* (1980) 26

---

[5] The interviewer testified at trial that when interviewing a child, her goal is to build rapport and make the child feel safe.

Cal.3d 557, 578; *In re L.K.* (2011) 199 Cal.App.4th 1438, 1446 (*L.K.*).) We must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Johnson*, at p. 576; *L.K.*, at p. 1446.)

Here, there is sufficient evidence from which the jury reasonably could have concluded Vierra engaged in oral copulation and sodomy of M.L. before his 11th birthday. During the forensic interview—which the prosecutor played in full for the jury—M.L. said Vierra first sexually assaulted him in January 2019, when he was ten years old. M.L. also told the interviewer that, during the incident, Vierra put his penis in M.L.'s "butt" and made M.L. "suck" his penis with his mouth. This evidence alone is sufficient to support Vierra's convictions for oral copulation and sodomy of a child under 11 years old. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) Although M.L. gave inconsistent testimony at trial, it is not our role as the reviewing court to resolve conflicts in the evidence, make credibility determinations, or reweigh the evidence. (*Ibid.*)

### 3. *Substantial evidence supports Vierra's conviction for sodomizing I.V.*

Vierra argues there is insufficient evidence to support his conviction in count 1 for sodomizing I.V. (§ 288.7, subd. (a)).

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a).) In *People v. Paz* (2017) 10 Cal.App.5th 1023, we held the sexual penetration element

17

of sodomy "requires penetration of the tissues that surround and encompass the lower border of the anal canal—that is, it requires penetration past the buttocks and into the perianal area but does not require penetration beyond the perianal folds or anal margin." (*Id.* at p. 1038.) Therefore, "penetration beyond the buttocks and into the perianal folds is sufficient to establish the requisite penetration—namely, sexual penetration of the anal opening." (*Id.* at p. 1029.) We emphasized that "mere penetration of the buttocks is not sufficient to establish penetration of the anal opening," and we advised prosecutors to "elicit precise and specific testimony to prove the required penetration beyond a reasonable doubt." (*Id.* at p. 1038.)

Vierra argues there is insufficient evidence that he penetrated I.V. beyond his buttocks. He contends J.L.'s testimony and statements about the incident were too contradictory and vague to support such a finding. He also points to the lack of testimony from I.V. or physical evidence of injury to the child's perianal area.

We agree with Vierra that J.L.'s statements alone are not sufficient to find, beyond a reasonable doubt, he sodomized I.V. At trial, J.L. testified that he looked into the bedroom and saw Vierra "[p]utting his dick on [I.V.'s] diaper." J.L. had previously told a forensic interviewer that he witnessed Vierra "rap[ing]" I.V. by "put[ting] his dick in [I.V.'s] butt." J.L. never clarified what he meant by these statements; nor did he ever explicitly state that Vierra penetrated I.V.'s perianal area. Even if J.L. had made such a claim, it is doubtful he would have been in a position to see actual penetration of I.V.'s perianal area. Therefore, the most a juror reasonably could infer from J.L.'s

observations is that Vierra penetrated I.V.'s buttocks, which alone is not sufficient to show sodomy.

Contrary to Vierra's suggestions, however, J.L.'s personal observations were not the only evidence supporting his conviction. J.L. testified that the incident occurred in 2018, meaning I.V. would have been either three or four years old at the time. It would be nearly impossible for a grown adult to penetrate such a young child's buttocks without also penetrating—however slightly—the child's perianal folds. The trial court, moreover, instructed the jury that under Evidence Code section 1108, it could consider evidence that Vierra committed other sexual offenses when determining whether he committed a sexual offense against I.V. Accordingly, from its findings that Vierra sodomized M.L. and D.M.—for which there was overwhelming evidence—the jury could infer that Vierra had a propensity to commit sodomy. From this, the jury reasonably could have inferred it was likely Vierra committed the same act on I.V. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1165 (*Villatoro*).) Considered with J.L.'s statements during the forensic interview and I.V.'s young age at the time of the incident, the jury reasonably could have concluded Vierra penetrated I.V.'s perianal area. Accordingly, substantial evidence supports his conviction on count 1 for sodomizing a child under 11 years old.

4. ***The prosecutor did not commit misconduct or violate Vierra's constitutional rights by asking questions about a conversation with his mother***

Vierra argues the prosecutor committed misconduct and violated his constitutional rights by asking him questions about a conversation in which his mother relayed information from his

19

attorney. Vierra contends the prosecutor's questions improperly "[sought] to intrude upon attorney thought processes, strategy and impressions—areas which fall within the generally recognized scope of attorney work product and which are protected by the right to counsel under the state and federal constitutions." He also argues the prosecutor's questions interfered with the attorney-client relationship and violated his constitutional right to counsel.

a. *Background*

In response to a question on cross-examination, M.L. testified that Vierra's pubic hair is black. Vierra subsequently testified that his pubic hair is light brown, but he would trim it because he has genital herpes and did not want to transmit the infection to his wife.

After this testimony, the prosecutor informed the court she had a recording of a jail phone call between Vierra and his mother, Mary, in which Mary told Vierra to shave his genitals before the preliminary hearing. The prosecutor also disclosed that she had a recording of a subsequent call in which Vierra said he could not shave his genitals because it burned. The court told the prosecutor she could ask Vierra about the comments and then use the tapes to impeach him if he denied making them. Vierra did not object.

On cross-examination, the prosecutor asked Vierra, "[I]sn't it true that you had conversations with your mother when you were in custody about shaving your genitals?" Vierra responded that they had briefly discussed the issue. The prosecutor continued, "She told you that your attorney wanted you to shave your genitals because he was going to present that at court; isn't that right?" Vierra replied, "I'm not a hundred

20

percent sure, ma'am, but I believe so." Vierra then acknowledged telling his mother it was very uncomfortable to shave his pubic hair. He explained that it was uncomfortable because he did not have the same grooming tools in jail as he had at home.

The prosecutor next asked Vierra why it was so important that he shave prior to the preliminary hearing. Defense counsel objected on the basis that the question called for attorney-client privileged information. The court sustained the objection.

A bit later, the prosecutor again asked Vierra why he had to shave prior to the hearing, to which Vierra responded, "To take care of myself and to maintenance myself." The prosecutor replied, "That's not what your mom said. She said to do it because it was at the direction—." Defense counsel objected, and the court admonished the prosecutor to "stay away from that topic, please." The prosecutor then asked Vierra several times whether he shaved before the preliminary hearing to try to discredit M.L. Defense counsel eventually objected, and the court told the prosecutor to "move on to another topic." The prosecutor asked Vierra several more questions about his pubic hair before the court admonished her to "move on from the pubic hair."

During a break, the prosecutor told the court she wanted to play the jail call recordings for the jury. The prosecutor argued they were relevant because they showed Vierra essentially trying to manufacture evidence—that he shaved his genitals—in order to impeach M.L.'s testimony regarding the color of his pubic hair.

Defense counsel told the court that, prior to the preliminary hearing, Vierra said the victims would not be able to identify his pubic area because he had shaved. Defense counsel advised him to continue shaving in case the court wanted to confirm that fact

21

in camera.  Defense counsel remarked that "this all stems from an attorney-client conversation."

The court noted that, although the conversation between Vierra and his mother was not privileged, "we're getting into a topic now that I'm very uncomfortable about. . . .  You're asking him to discuss in front of the jury what his attorney might have told him to do or not to do."  The court continued, "It opens up a whole new can of worms that's not probative [of] the actual issue at hand. . . .  [It would be more probative] [i]f he tells his mom, look, I'm not going to shave because I've never done this before, it makes me feel real uncomfortable[.]  [I]f he's equivocating, then it's not that probative to me."

The court ultimately excluded the recording of the conversation under Evidence Code section 352, finding it was prejudicial and "of dubious probative value."

   b.    *Vierra forfeited his prosecutorial misconduct claims;*
         *they also lack merit*

Prosecutorial misconduct violates the 14th Amendment when it is "so egregious as to deny the defendant a fair trial." (*People v. Harris* (1989) 47 Cal.3d 1047, 1080; see *People v. Tully* (2012) 54 Cal.4th 952, 1009–1010.)  Even if the prosecutor's misconduct does not make the trial unfair, " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury' " ' " violates California law.  (*Tully*, at pp. 1009–1010.)  Absent a showing that an objection or request for admonition would have been futile or that the harm could not have been cured, an appellant may not complain of prosecutorial misconduct unless he timely objected to the alleged misconduct at trial and asked the court to admonish the jury to disregard

the impropriety.  (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*); *People v. Morales* (2001) 25 Cal.4th 34, 43–44.)

　　　We agree with the Attorney General that Vierra forfeited his prosecutorial misconduct claims by failing to raise a specific objection and request a curative admonition from the trial court. On appeal, Vierra contends the prosecutor engaged in misconduct by suggesting, through her questioning, that defense counsel instructed him to shave his pubic hair as part of his defense strategy.  Vierra, however, did not object at trial when the prosecutor first asked him if "[your mother] told you that your attorney wanted you to shave your genitals because he was going to present that at court; isn't that right?"  Although Vierra subsequently objected to similar questions, he did not do so on the grounds he raises on appeal:  that the questions constituted prosecutorial misconduct, improperly sought the revelation of attorney work product, and interfered with the attorney-client relationship.  Nor did he seek a curative admonition from the court.[6]  His failure to do so forfeits the issue on appeal.  (*Hill, supra*, 17 Cal.4th at p. 820.)

　　　Even if we were to overlook the forfeiture, we would reject Vierra's arguments on the merits.  Contrary to his suggestions, it is not, per se, improper for a prosecutor to question a defendant at trial about his defense strategy.  (See, e.g., *People v. Lund* (2021) 64 Cal.App.5th 1119, 1146 [prosecutor did not commit misconduct by questioning defendant about his decision not to call an expert witness].)  Nor was it improper for the prosecutor

---

[6]　　We reject Vierra's conclusory assertion, made without any meaningful analysis, that an admonition would not have cured any resulting harm.

in this case to explore whether Vierra lied about regularly trimming his pubic hair in an attempt to discredit M.L.'s testimony.  Although some of the prosecutor's questions seemed to call for the disclosure of privileged information, it is a stretch to characterize them as deceptive, reprehensible, or egregious. The court, moreover, sustained Vierra's objections on that basis, which signaled to the jury that the prosecutor's questions were improper.

Nor is it self-evident—and Vierra does not meaningfully explain—how the prosecutor interfered with the attorney-client relationship or effectively denied him the right to counsel. Vierra analogizes to cases in which a state agent was present at attorney-client conferences or intentionally intercepted confidential attorney-client communications.  (See *People v. Suarez* (2020) 10 Cal.5th 116; *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1255; *Barber v. Municipal Court* (1979) 24 Cal.3d 742, 752.)  Here, however, Vierra concedes that the conversation with his mother was not privileged or confidential, and the prosecutor did not improperly intercept it.  He also does not claim that he inadvertently revealed privileged or confidential information in response to the prosecutor's questions. We fail to see how the prosecutor's questions, in and of themselves, interfered with the attorney-client relationship or effectively denied Vierra the right to counsel.

5. ***We reverse Vierra's conviction for continuous sexual abuse***

Vierra argues the jury erroneously convicted him of both continuous sexual abuse of M.L. (§ 288.5, subd. (a); count 13), as well as four counts of committing a lewd act on M.L. during the same time period (§ 288, subd. (a); counts 8–11).  He contends

24

the proper remedy is to dismiss the specific lewd act convictions. The Attorney General concedes the error, but argues the proper remedy is to reverse the continuous sexual abuse conviction.

Section 288.5, subdivision (a) punishes any person who lives in the same home with a minor child and who, over a period of at least three months, engages in three or more sex crimes with a child under 14, including committing lewd acts as defined in section 288. Section 288.5, subdivision (b) states a jury "need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number." To avoid multiple convictions, subdivision (c) states: "No other . . . lewd and lascivious acts . . . involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative."

In this case, the People charged Vierra with continuous sexual abuse of M.L. between March 14 and June 30, 2019 (§ 288.5, subd. (a); count 13), as well as four counts of committing a lewd act on M.L. during the same time period (§ 288, subd. (a); counts 8–11). The People, however, failed to charge the counts in the alternative, and the jury convicted Vierra of all five offenses. The parties agree, as do we, that this was error. (*People v. Johnson* (2002) 28 Cal.4th 240, 248.) The only question is the proper remedy.

In *People v. Torres* (2002) 102 Cal.App.4th 1053 (*Torres*), the court faced a similar situation and concluded the proper remedy was to dismiss the continuous sexual abuse conviction and leave the defendant convicted of the specific sex offenses. The court reasoned that "section 288.5, subdivision (c) gives the

25

prosecutor maximum flexibility to allege and prove *not only* a continuous sexual abuse count, but also specific felony offenses commensurate with the defendant's culpability, subject only to the limitation that the defendant may not be *convicted* of both continuous sexual abuse and specific felony sex offenses committed in the same period.  It therefore is also appropriate, in deciding which convictions to vacate as the remedy for a violation of the proscription against multiple convictions set forth in section 288.5, subdivision (c), that we leave appellant standing convicted of the alternative offenses that are most commensurate with his culpability." (*Id*. at p. 1059.)  The court concluded the convictions for specific sex offenses were more commensurate with the defendant's culpability because the defendant faced a greater maximum aggregate penalty for those offenses, and the trial court had stayed execution of sentence on the section 288.5 offense.  (*Torres*, at p. 1060.)

The same remedy is warranted here.  Because of the number and severity of the lewd act charges, Vierra faced a significantly greater maximum aggregate penalty for those counts than he did for the single continuous sexual abuse count. The trial court, moreover, imposed four consecutive 15-year-to-life sentences on the specific lewd act offenses, and it stayed the sentence on the continuous sexual abuse offense.[7]  As in *Torres*, Vierra's convictions for the lewd act offenses are more commensurate with his culpability.  Accordingly, the appropriate remedy is to reverse Vierra's conviction for continuous sexual

---

[7]     The court did not orally impose a sentence on the continuous sexual abuse count before staying the sentence under section 654.  The court's minute order, however, states it intended to impose the midterm of 12 years.

26

abuse.  (See *Torres, supra*, 102 Cal.App.4th at p. 1061; *People v. Wilson* (2019) 33 Cal.App.5th 559, 574 ["in the case of dual convictions, the court should leave the defendant convicted of the offense most commensurate with his culpability"].)

Vierra contends we must reverse the lewd act convictions under the "special over the general" rule.  The "special over the general" rule provides that when two statutory provisions are in conflict, the more specific "special" statute generally controls over the more general statute.  (See *People v. Williamson* (1954) 43 Cal.2d 651, 654.)  Under this rule, Vierra argues, the continuous sexual abuse statue should control since it is more specific than the lewd act statute.

The *Torres* court rejected an identical argument.  As the court explained, in "*People v. Hord* (1993) 15 Cal.App.4th 711, 720–721, the [Court of Appeal] specifically rejected the contention that section 288.5 is a special statute that precludes prosecution for other generally applicable sexual offenses.  Moreover, in *People v. Johnson* [(2002) 28 Cal.4th 240], the [California Supreme Court] was careful to note that nothing in its opinion was inconsistent with the analysis in *People v. Hord, supra*, 15 Cal.App.4th 711 . . . ."  (*Torres, supra*, 102 Cal.App.4th at p. 1058.)  We agree with the *Torres* court that the "special over the general" rule does not apply to this situation.  Indeed, it "would be anomalous if section 288.5, adopted to prevent child molesters from evading conviction, could be used by those molesters to circumvent multiple convictions with more severe penalties . . . than available for a conviction under section 288.5."  (*People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1177–1178.)

We also reject Vierra's contention that we should dismiss the lewd act convictions because he already faces a long

27

indeterminate aggregate sentence for his other offenses. Vierra's sentences on those other counts—which concern completely separate incidents—are irrelevant to his culpability on the individual lewd act and continuous sexual abuse counts. Accordingly, they do not require that we dismiss the individual lewd act convictions.

**6.** ***The court did not abuse its discretion by admitting CSAAS testimony***

Vierra argues the trial court erred in admitting Jones's expert testimony regarding CSAAS. He asserts the court failed to perform its gatekeeper role under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*), and, had it done so, it would have excluded the testimony as unreliable and speculative. He also suggests the evidence failed to meet the reliability standard mandated by *Kelly/Frye*.[8]

We agree with the Attorney General that Vierra forfeited these issues by failing to raise them below. (See Evid. Code, § 353; *People v. Ochoa* (1998) 19 Cal.4th 353, 414 ["Having failed to object on *Kelly/Frye* grounds to the admission of the evidence . . . defendant has not preserved his claim."]; *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1193 [defendant forfeited his contention that testimony was inadmissible under Evidence Code sections 801 and 802 by failing to object on that basis in the trial court].) Nevertheless, we will consider his arguments on the merits in order to forestall his alternative ineffective assistance of counsel claim.

---

[8]     *People v. Kelly* (1976) 17 Cal.3d 24, 30; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

For more than three decades, California courts have consistently held CSAAS evidence is admissible in criminal trials for the limited purpose of disabusing the jury of common misconceptions about child victims of sexual abuse. (See, e.g., *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*) [CSAAS evidence may be admitted to rehabilitate a "witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation"]; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)

Despite this authority, Vierra contends the trial court should have excluded Jones's CSAAS testimony because it did not meet the standard for expert testimony that the California Supreme Court articulated in *Sargon.* In that case, the high court held that "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon, supra,* 55 Cal.4th at pp. 771–772.) In its gatekeeper function, the "court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. . . . The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion." (*Id.* at p. 772.) "Except to the extent the trial court bases its ruling on a conclusion of

law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion." (*Id*. at p. 773.)

Vierra has not shown the court abused its discretion by admitting Jones's testimony. Jones explained that her testimony was based on the work of Dr. Roland Summit, who developed CSAAS using his own clinical experience as well as the clinical experiences of other professionals. According to Jones, there have been 30 to 50 research studies examining the model, it has been in regular use for training and education purposes, and it is generally accepted in the scientific community. Jones also explained that she uses the model in her own clinical practice, in which she has treated somewhere between 700 and 900 child victims of sexual abuse. Vierra did not dispute this testimony at trial or present any evidence even suggesting CSAAS in general, or Jones's testimony in particular, is invalid or unreliable. Vierra, in fact, did not even cross examine Jones. On this record, he has not shown the court abused its discretion by admitting testimony that was "clearly invalid and unreliable." (*Sargon, supra*, 55 Cal.4th at pp. 772–773.)

Vierra contends Jones's testimony fails the *Sargon* test because she presented no studies to support the validity or reliability of CSAAS. *Sargon*, however, requires no such thing. In any event, as noted above, Jones testified there have been 30 to 50 research studies examining CSAAS. While she did not specifically testify that those studies concluded CSAAS is valid and reliable, it is reasonable to infer at least some studies came

to that conclusion based on Jones's testimony that CSAAS is generally accepted in the scientific community.[9]

Vierra next claims Jones's testimony was too speculative to be helpful for the jury because the CSAAS components she identified are present in every case in which a child has been sexually abused. Assuming Vierra's latter assertion were true, we fail to see how it would render Jones's testimony speculative or unhelpful. The same is true of Vierra's contention that Jones's testimony was inadmissible because both abused and non-abused children exhibit many of the behaviors that are part of CSAAS. Contrary to Vierra's suggestions, this is precisely the reason Jones's testimony was helpful for the jurors; it informed them that some abused children exhibit behaviors that the jurors might have expected only from non-abused children. Such behaviors, therefore, are not good indicators of whether a child has been abused.

There is similarly no merit to Vierra's suggestion that Jones's testimony was inadmissible under *Kelly/Frye*. In *People v. Munch* (2020) 52 Cal.App.5th 464, the court explained that *Kelly/Frye* applies only to new experimental scientific evidence not previously accepted in court. (*Munch*, at p. 472.) CSAAS does not fit within that category because it has "been ruled to be properly admitted by the courts of this state for decades. . . .

---

[9] We decline to consider the articles criticizing CSAAS that Vierra cites for the first time in his reply brief. The articles were not before the trial court and are not part of the appellate record. Nor has Vierra explained why he did not include them in his opening brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [arguments raised for the first time in a reply brief are forfeited].)

[C]ourts have long recognized the well-established relevance, necessity, reliability, and importance of this evidence." (*Ibid*.) The *Munch* court further explained that when CSAAS testimony is based on the expert's clinical experience and familiarity with professional literature in the area, it meets the traditional standard for competent expert opinion without the need for the additional screening procedures of *Kelly/Frye*. (*Munch*, at p. 473.) We agree with the *Munch* court and reject Vierra's arguments for the same reasons.

## 7. *Vierra's CALCRIM instructional error arguments lack merit*

Vierra contends three of the trial court's jury instructions—CALCRIM Nos. 1191B (evidence of other sex offenses), 1193 (CSAAS evidence), and 331 (testimony from a witness with a developmental disability)—misstated the law or otherwise violated his constitutional rights.[10]

### a. *Standard of review*

We review "the wording of a jury instruction de novo and assess[ ] whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged

---

[10] The Attorney General contends Vierra forfeited these arguments by failing to object to any of the challenged instructions in the trial court. With one exception—that we discuss below—Vierra contends the court's instructions misstated the law. Such arguments are not subject to the general forfeiture rule, and a defendant may raise them for the first time on appeal. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.)

32

instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We presume the jurors were able to understand and correlate all the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

> b.    *CALCRIM No. 1191B*

Under Evidence Code section 1108, "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 1108 applies to evidence of both charged and uncharged sexual offenses. (*Villatoro, supra*, 54 Cal.4th at p. 1156.)

At the prosecutor's request, the trial court instructed the jury with CALCRIM No. 1191B as follows:

> "The People presented evidence that the defendant committed the crimes as charged in Counts 1 through 14.
>
> "If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

Vierra contends that by informing the jury it could " 'conclude' " he committed an offense based on a finding that he committed another charged offense, the court's instruction effectively permitted the jury to convict him based solely on evidence that he committed a different crime. He also contends the instruction is constitutionally infirm because it does not put a limit on the weight the jury may ascribe to other crimes evidence.

As Vierra acknowledges, his argument is foreclosed by binding California Supreme Court precedent.[11] In *People v. Reliford* (2003) 29 Cal.4th 1007, our state's high court rejected a similar challenge to CALJIC No. 2.50.01, which concerns the use of evidence of other sex offenses as propensity evidence. Like Vierra, the defendant in that case argued the instruction improperly conveyed to the jury that it could rely solely on evidence of the other offenses to convict him of the charged crime. The high court concluded there was no risk of such an interpretation given the trial court also instructed the jury the People must prove every element of the offense beyond a reasonable doubt, and the other crimes evidence was alone not

---

[11] Vierra states he raises the issue on appeal in order to preserve it for later review.

34

sufficient to convict the defendant. (*Reliford*, at pp. 1013–1014.) The court went on to reject the argument that the instruction improperly accorded the jury complete discretion to determine the weight of the other crimes evidence. As the court explained, "the instruction adequately confines the weight and significance of uncharged offenses within constitutional bounds by warning . . . that the uncharged offense is 'not sufficient by itself to prove beyond a reasonable doubt that [defendant] committed the charged crime.' Jurors would reasonably understand that the weight and significance they may accord this evidence must stay within these parameters." (*Id.* at p. 1014.)

There are no material differences between CALCRIM No. 1191B and the instruction at issue in *Reliford*.[12] Moreover, the trial court's instruction in this case expressly advised the jury that other crimes evidence is "one factor to consider along with all the other evidence," such evidence "is not sufficient by itself to prove that the defendant is guilty," and the "People must still prove each charge and allegation beyond a reasonable doubt." The court also instructed the jury with CALCRIM No. 220, which defined the reasonable doubt standard and informed the jury a "defendant in a criminal case is presumed to be innocent" and this "presumption requires that the People prove a defendant guilty beyond a reasonable doubt." As in *Reliford*, considering the instructions as a whole, there is no reasonable likelihood the jury understood CALCRIM No. 1191B in the manner Vierra

_____

[12]    We reject Vierra's contention that there is a meaningful difference between the words "conclude" (found in CALCRIM No. 1191B) and "infer" (found in CALJIC No. 2.50.01), at least as they are used in these instructions. (See Black's Law Dict. (11th ed. 2019) [defining "infer" as "[t]o conclude from facts or from factual reasoning"].)

35

suggests.  The court's instruction did not deprive Vierra of the presumption of innocence or relieve the prosecution of its burden to prove each offense beyond a reasonable doubt.  (See *Villatoro, supra*, 54 Cal.4th at p. 1167 [holding a modified version of CALCRIM No. 1191 that is substantially similar to CALCRIM No. 1191B did not impermissibly lower the standard of proof or otherwise interfere with the presumption of innocence].)

Vierra alternatively argues the court erred by failing to consider the factors listed in Evidence Code section 352 before instructing the jury with CALCRIM No. 1191B.  Although "evidence of the charged offenses may not be excludable under section 352, . . . nothing precludes a trial court from considering section 352 factors when deciding whether to permit the jury to infer a defendant's propensity based on this evidence."  (*Villatoro, supra,* 54 Cal.4th at p. 1163.)  " 'Even where a defendant is charged with multiple sex offenses, they may be dissimilar enough, or so remote or unconnected to each other, that the trial court could apply the criteria of section 352 and determine that it is not proper for the jury to consider one or more of the charged offenses as evidence that the defendant likely committed any of the other charged offenses.' "  (*Ibid.*)  A trial court is not required to expressly weigh the Evidence Code section 352 factors—or expressly state it has done so—before instructing a jury with CALCRIM No. 1191B.  (*Villatoro,* at p. 1168.)  It is enough that the record supports an inference that the court implicitly considered them.  (*Ibid.*)

At the outset, we agree with the Attorney General that Vierra forfeited this issue by failing to raise it below.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 138 [defendant forfeited argument based on Evidence Code section 352 by failing to object on that

basis at trial].)  Nevertheless, we will consider his argument on the merits in order to forestall his alternative ineffective assistance of counsel claim.

Contrary to Vierra's claims, the record supports an inference that the trial court implicitly considered the Evidence Code section 352 factors before instructing the jury with CALCRIM No. 1191B.  While discussing jury instructions, the prosecutor suggested the court instruct the jury it could consider every charged offense when determining Vierra's guilt on every other offense.  The court noted it had a "problem with some of these instructions" and asked the prosecutor if she was "sure" she wanted to include the pornography counts in the CALCRIM No. 1191B instruction.  The prosecutor responded that the "law allows us to put it in."  The court replied, "All right.  You've got it."  It is apparent from this exchange that the court was mindful of the Evidence Code section 352 factors—and particularly the requirement that the risk of undue prejudice not substantially outweigh the evidence's probative value—while deciding whether to give the instruction.  Accordingly, the court did not err in this respect.

c. *CALCRIM No. 1193*

The trial court instructed the jury with CALCRIM No. 1193 as follows:

> "Dr. Jones's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.
>
> "You may consider this evidence only in deciding whether or not [the victims'] conduct was not inconsistent with the conduct

37

of someone who has been molested, and in evaluating the believability of [their] testimony."

Vierra takes issue only with the last phrase of the court's instruction, which informed the jurors they could consider Jones's testimony "in evaluating the believability of [the victims'] testimony." He argues this phrase misstates the law and erroneously permitted the jurors to use CSAAS evidence as support for the truth of the allegations made against him.

We do not think it is reasonably likely the jurors understood the court's instruction in the manner Vierra suggests. The instruction plainly and unequivocally informed the jurors that Jones's testimony "is not evidence that [Vierra] committed any of the crimes charged against him." It also informed the jurors they may consider the testimony "only" when deciding whether the victims' conduct was inconsistent with the conduct of someone who has been molested. Read in this context, we are confident the jurors understood the last phrase to mean they could use Jones's testimony to evaluate the believability of the victims' accounts, but only in light of the evidence suggesting their conduct was inconsistent with that of an abused child. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 [rejecting contention that CALCRIM No. 1193 permitted the jury to conclude the victim was molested].) This is a correct statement of the law. (See *McAlpin, supra*, 53 Cal.3d at pp. 1300–1301 [CSAAS evidence may be used to rehabilitate a witness's credibility when the defendant suggests the witness's conduct is inconsistent with having been molested]; Black's Law Dict. (11th ed. 2019) [a "credible witness" is a "witness whose testimony is believable"].)

d.      *CALCRIM No. 331*

Section 1127g provides that in "any criminal trial or proceeding in which a person with a developmental disability, or cognitive, mental, or communication impairment testifies as a witness, upon the request of a party, the court shall instruct the jury" with language substantially identical to CALCRIM No. 331.  Because the jury in this case heard testimony from J.L., who is autistic, the trial court instructed it with CALCRIM No. 331 as follows:

> "In evaluating the testimony of a person with a developmental disability, consider all of the factors surrounding that person's testimony, including his . . . level of cognitive development.
>
> "Even though a person with a developmental disability may perform differently as a witness because of his . . . level of cognitive development, that does not mean he . . . is any more or less credible than another witness.
>
> "You should not discount or distrust the testimony of a person with a developmental disability solely because he . . . has such a disability."

Vierra takes issue with the second paragraph of the instruction, which advised the jury that "[e]ven though a person with a developmental disability may perform differently as a witness because of his . . . level of cognitive development, that does not mean he . . . is any more or less credible than another witness."  He contends this admonition is flawed because if a witness's developmental disability "causes him to perform

39

differently than other witnesses, his testimony must reflect an impaired ability to perceive, understand, remember or communicate." Therefore, he suggests, by instructing the jurors to ignore differences in J.L.'s performance as a witness, the court essentially told them to ignore or discount his impairments in perceiving, understanding, remembering, or communicating, which were central to his credibility.

We fundamentally disagree with the central premise of Vierra's argument. Contrary to his contentions, a difference in a witness's performance due to a developmental disability does not necessarily reflect an *impaired* ability; instead, it may simply reflect a *different* ability. It is precisely because of common misconceptions like Vierra's that instructions such as CALCRIM No. 331 are necessary. Moreover, as Vierra acknowledges, courts have consistently upheld the constitutionality of CALCRIM No. 331 and other similar instructions. (See, e.g., *People v. Catley* (2007) 148 Cal.App.4th 500 (*Catley*) [upholding CALCRIM No. 331]; *People v. Byers* (2021) 61 Cal.App.5th 447, 457 [same]; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1393 [upholding similar jury instruction concerning child witnesses]; *People v. McCoy* (2005) 133 Cal.App.4th 974, 978–980 [same].)

In *Catley*, for example, the court held CALCRIM No. 331 does not unduly inflate the testimony of the witness or otherwise violate a defendant's right to due process. (See *Catley*, *supra*, 148 Cal.App.4th at pp. 507–508.) The court explained that, like a similar instruction concerning child witnesses, CALCRIM. No. 331 " 'provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom " 'traditional assumptions' " may previously have biased the factfinding process.' " (*Catley*, at p. 508.) Moreover, although

40

a defendant is entitled to fairness, " 'he or she cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result.' " (*Id*. at p. 507.)  We agree with the *Catley* court and reject Vierra's arguments for the same reasons.

8.    ***We remand the case for the trial court to comply with Senate Bill No. 567***

Vierra contends his case must be remanded for resentencing on counts 3, 4, and 12 in accordance with Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567).  The Attorney General concedes the issue.

When the trial court sentenced Vierra, section 1170 provided that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."  (Former § 1170, subd. (b).)  Under this provision, the trial court was free to impose an upper term sentence based on any aggravating circumstances it deemed significant, so long as they were reasonably related to the decision being made.  (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196.)

While Vierra's appeal was pending, Senate Bill 567 went into effect.  It restricts a trial court's discretion to impose an upper term sentence.  Effective January 1, 2022, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(2).)  The newly amended section 1170 also directs the court to impose the lower term when certain

41

mitigating circumstances are present, unless the court finds the aggravating circumstances outweigh the mitigating circumstances. (§ 1170, subd. (b)(6).)

The parties agree, as do we, that because Vierra's case was not yet final when Senate Bill 567 went into effect, he is entitled to the retroactive benefit of the ameliorative legislation. (See *In re Estrada* (1965) 63 Cal.2d 740, 744–745; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) The parties also agree that the trial court did not comply with Senate Bill 567 when it sentenced Vierra, and the appropriate remedy is to remand the case. We agree with the parties and remand the case for compliance with Senate Bill 567. On remand, the People may elect either to have a trial on the aggravating factors or to submit to resentencing on the current record.

## DISPOSITION

We reverse David Vierra's conviction for continuous sexual abuse (§ 288.5, subd. (a); count 13).  We vacate his sentence and remand the case for further proceedings in accordance with this opinion.  We affirm the judgment in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


RICHARDSON (ANNE K.), J.*

---

*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.